I would like to reserve five minutes of my time for rebuttal. This morning I intended, unless the Court has questions on other issues, to devote most of the discussion to two issues. First, the supplemental jury instruction following John Bussell's death, and second, the fundamental ambiguity of certain terms in the bankruptcy There had been more than three-and-a-half months of trial, three days of closing arguments, and the jury was in its third day of deliberation. Given the stage of the proceedings at which he died, we contend it was error for the Court to have instructed the jury at that time that the case against John Bussell had been disposed of and was no longer before them, that the disposition should not influence their verdict. While in some context disposition may have been understood, or may not have been understood at all, at this time there were only three possibilities. Either he had pleaded guilty, the government had dismissed the case, or he had passed away. Given how this case had been litigated intensely, aggressively for weeks and weeks, with virtually every witness cascaded with objections to every question, there is no way that the jury could have heard the Court's remarks that the case had been disposed of and reached any conclusion other than that John Bussell had pleaded guilty. That instruction, although it was derived from a pattern jury instruction, the pattern jury instruction was not based on any case from this circuit, and it was not based on any case with similar circumstances. The cases cited in the pattern jury instruction are all mid-trial cases. In none of those cases were the same words that were used here provided to the jury. Two of the cases were actually mid-jury acquittals or mid-trial acquittals where the Court had granted a Rule 29 motion and an appellant had said it was prejudicial to have advised the jury of the acquittal based on insufficiency of the evidence because it suggested that the evidence was sufficient as to the remaining defendant. Those cases are not at all similar to this case. There are other cases in other circuits that use the same or similar language to the instruction that was given here, but with one exception, all of those cases are mid-trial or commencement of trial guilty plea cases. The one case which was not a guilty plea and which is cited by the government, the Goodman case, is a case where a co-defendant committed suicide during the trial, but the issue there was not the wording of this instruction. The issue was whether or not it was error for the Court not to voir dire the jury regarding  it. Well, I mean, it seems we have here an extraordinary circumstance, and I haven't found a case from any jurisdiction that gives very good guidance as to what to do in this circumstance. Is there something that you were able to identify, and perhaps more importantly, was there anything that was identified to the Court at that time which was operating under time pressure for the same reason, concern about news coverage and what the jury might learn about? I agree completely that this is unprecedented, that certainly nobody expected this. No one had any reason to believe that John Bissell was going to fall to his death on February 5th. What this Court has said in the Jones case more than 30 years ago is when a co-defendant's case is no longer pending, what the rules, what the Court should do is to give a simple and honest statement as to what happened. Telling the court or telling the jury that the case had been disposed of was not an honest statement. There was no disposition of the case. Disposition under the ordinary meaning of the word is a settlement or a final settlement of something. There was no settlement here. Technically, what had happened is the government had dismissed the case. And I can understand that the Court might not have wanted or the government may not have wanted to have conveyed a different impression by saying that the government, after three and a half months of trial, had dropped the charges. But all the Court had to say was that John Bissell died this morning, and for that reason, the case against him is no longer before you. Wouldn't there be at least some concern that that might also distort the deliberative process, that it could evoke sympathy for Dr. Bissell, or somehow that type of information might have unintended consequences, so it'd be safer to say something neutral like disposed of? Well, but the problem, Your Honor, is disposed of is not neutral. And it was a difficult situation. The problem is, is that the choice that the Court made led directly to the jury concluding that, in fact, John Bissell had pleaded guilty, has had the other – the two other lawyers in the case. Now, the Court could have allowed them to continue to deliberate. The Court made the decision almost simultaneously to sequester the jury, so there was no – the concern about the jury learning about the death was minimized. And then the verdict could have been sealed. I understand that the Court didn't – it had been a very lengthy proceeding. It had been estimated the case would be concluded more than a month earlier than it went to the jury. And I can understand that the judge, as she said, didn't want them to be deliberating one minute more as to John Bissell. But given those few choices available, I think the Court either had to say the truth, that is, if John Bissell died this morning and that's why you're not going to be deliberating any further as to him, or the Court should have allowed them to continue to deliberate while sequestering the jury and sealed the jury verdict. Anything else was going to lead to the erroneous conclusion that there was a guilty plea. And we know from what happened, according to the affidavit of one juror, they had not even begun the deliberations as to my client, LaTantia Bissell, as of the time they were told to stop deliberating as to John Bissell. Four hours later, they'd reached a verdict in a very complicated case that consumed, you know, 10,000 pages of transcript and 50 volumes of exhibits. So I don't think that there can seriously be any dispute that that's the case. But did reach a verdict that shows some discretion. It wasn't checking the box guilty for each of the counts. I agree with Your Honor. There were nine counts. They acquitted on three. But the evidence as to the three was very limited as to my client. The crux of the case against my client was that she was the dermatologist. The dermatology practice had been restructured into three separate corporations. And the bankruptcy schedules did not reference one of the corporate or did not reference two of the corporations, BBL Medical Management and Beverly Hills Medical, the two corporations created on the advice of the lawyers Beaudry and Sherman. The three counts of which she was acquitted, one count was whether she had committed perjury in saying that she wasn't actively involved in any corporation other than her professional corporation. The evidence from the people working in the office is that she wasn't running the business of BBL Medical. She wasn't paying the bills, scheduling the patients, dealing with the landlords, et cetera. She was acquitted of tax evasion for 1996, which relates to the government contention that after funds were withdrawn from a BBL account in 1996 and then they were sent by Mr. Beaudry through a series of transfers all over the world and into Mr. Beaudry's account, all of the evidence as to that was concerned actions that John Busell was taking. The only real testimony as to my client is that she was physically present in Switzerland on a vacation when a bank account was opened. So the evidence on that count was very weak, and the last count of which she was acquitted, concealment of the equity and the condominium in Utah, again, the evidence was all that the dealings with respect to that condominium were handled by John Busell. So the fact that the jury acquitted on three counts in this case because the three counts are so separate from the other five counts of which she was convicted, I don't believe leads to the conclusion that the jury, notwithstanding the speed with which it resolved the case after getting this instruction, was not affected by the instruction. Let me turn to the argument on fundamental ambiguity. As I just said, the government's contention is that in response to certain questions on bankruptcy schedules, in particular question 12 in schedule B and question 16 in the Statement of Financial Affairs, that my client was obligated to list BBL Medical Management and Beverly Hills Medical. The indictment gives prominence to question 12. It's in paragraph 35 and paragraph 37, and there's a subheading about concealment of interest. In the first count, the reference to paragraph 35 and paragraph 37 is incorporated into paragraphs 2, 3, two counts 2, 3, 5, 6, and 12, all of the counts of the conviction. Our position is that the terms interest incorporation, as in question 12, or the term managing executive, as in question 16, are fundamentally ambiguous. But even if they are, isn't whatever she thought she had that was hers, whether you call it interest or anything else, isn't going to be caught by the catch-all at the end? Is there anything else that you've got? Well, the problem here is the way the government charged the case. The government didn't charge that she concealed personal property. The government focused the case on question 12. And so if you look at not just paragraphs 35 and 36 and the specific allegations, for example, in counts 5 and 6, what they did here is they charged that there was an obligation on the part of the Bucelles to list BBL Medical Management in response to question 12. And they called an expert witness, underscoring that this is not a term that men of ordinary intellect could come to a mutual understanding on. The government felt it necessary to call someone who had more than 20 years as a bankruptcy lawyer representing debtors and creditors and supervising thousands of cases as a trustee, and to ask him what his opinion was, and to paraphrase the question, to preface the questions by saying, based on your experience, you know, as a lawyer, as a trustee, what do you understand the term interest to mean? And he said that I think interest applies when you're someone who's controlling the corporation. But when he was asked with respect to question 12, well, how is an individual debtor to ascertain the meaning of the term interest? Because here, interest is not defined in the schedule. It's not defined in the bankruptcy petition. It's not defined in the instructions to the schedule. It's not defined in the bankruptcy code or in the regulations. What Mr. Albert, the expert witness, said is, well, I suppose most debtors seek advice of counsel. Exactly. And what this Court said in the Taub case a couple months ago, where it was reviewing a determination that Mr. Taub had engaged in the unauthorized practice of law because he had given advice concerning the meaning of an undefined term in Schedule B to the bankruptcy schedule. He says that involves, you know, the kind of interpretation that lawyers give. And so there is no question that the term interest was not defined and that it was fundamentally ambiguous. As to my client, there's no evidence that it was. But I'm still struggling with my question, which is, accept that proposition. The same form has question, what is it, 33, something like that, to list other personal property. If the government had tried the case just on the theory that... Well, the indictment isn't limited to question 12, is it? I thought the indictment, as I go rummaging through quickly, and I still haven't found the right page, my recollection is that the indictment was not so narrow as to focus only on the answer to a single question. But the indictment includes allegations as to fundamentally ambiguous questions. And the law is settled, and the government does not dispute this, that if there is a conviction that may have been based on an answer to a fundamentally ambiguous question, that constitutes a legal error. And when there is a legal error, it doesn't matter whether the evidence... Is the law settled in the context where even if you define interest in a way that doesn't get picked up by question 12, you have to pick it up in question 33? Is there anything in question 33 that is ambiguous that omits whatever is left out of question 12? I haven't seen it. The defense here was that they relied on the advice of counsel. And the government put forth an expert witness who said you should have put it, you should have checked the box next to 12 and written VBL medical management. But they didn't put it in. The jury heard that, and the jury may have said we saw what Mr. Albert had to say, and we believe notwithstanding all of the credentials of Mr. Beaudry and all the reasons why they could have believed in him, we've now heard this guy who has all this experience, and he's telling us it should have been there. But they didn't put it in at all. I think that's what Judge Clifton is saying, that one way or another it should have been on the schedule. So to say that we didn't put it on the schedule because we didn't understand question 12 doesn't ring true. Essentially what I understand the court to be saying is that the evidence was sufficient that assets were concealed. But the rule is when you're dealing with both legal error and arguments about sufficiency of the evidence, and for the moment I'm not conceding that VBL had to be disclosed at all. If you look at the Ryan case, which is cited with approval by this Court in Culleton, what Ryan involved were three statements, three questions that were answered, and the government contended that all three questions were answered inaccurately. You know, it's one form, three questions. They're all answered in the government's estimation inaccurately. What the Third Circuit said in that case is that one of the questions contained fundamentally ambiguous terms, and we cannot tell whether or not the jury's verdict, because it was one count that included both a permissible allegation and an impermissible allegation, we cannot tell that the jury's verdict was based on permissible reasons, on the two other statements that we find there was factual, were not ambiguous, and the evidence was sufficient as to. And because we cannot tell, we are not allowed to engage in conjecture surmise. We send the case back. You have to reverse because there is a fundamentally ambiguous question. And that's the rule that applies here. And, again, I. Roberts. That may be the legal answer, and I, and certainly we'll explore that. But is there a logical reason to segregate Question 12 and look at it in isolation? And you have a form that's intended to pick up the universe, and that's why at the end there's a catch-all. It could be, I take it it could be charged. You may be alleging here that it wasn't charged. If I had indicted this case, there wouldn't be anything in here about Question 12. Question 12 has nothing to do with this case. And, frankly, what the government was alleging here was essentially, I mean, there was no claim that BBL was a sham corporation. It was a legitimate corporation. It was adequately capitalized. The government didn't claim that the income should have been declared by the Bucells. There's a tax evasion count here against John Bucell and Jeffrey Sherman saying that you underreported the income from BBL. So it's not a sham corporation. Medical management corporations are very common. There's nothing wrong with them. The question here is whether or not the retention of the profits by this corporation is something that should have been disclosed. In effect, whether or not there was some kind of an oral understanding that even though my client wasn't a stockholder, wasn't an officer, wasn't a director, didn't have any legal ownership of that company, whether she had some right of access to those funds that should have been disclosed to the bankruptcy trustee. And if she had such a right, there actually was a question on the bankruptcy questionnaire that called for that. It's not Question Number 12. It's Question Number 18, which is talking about rights and property or equitable understandings. But, again, the way the case was tried, when Mr. Stern stood up and gave his closing argument, he began and he said, there are five lies here in this case. And then he asked to put on the monitor Page 10 of Exhibit 2, which is Question 12. And he said, it says here, interest in corporations. Lie Number 1, they didn't disclose BBL. Lie Number 2, they didn't disclose Beverly Hills Medical. That was the government's theory. They decided that they were going to pigeonhole this case into Question 12 or Question 16 on the Statement of Financial Affairs, the term managing executive, which, again, is undefined, and I don't, to this day, know what it means. But having decided that's the way they were going to try the case, they ran the risk that the jury was going to listen to their expert witness and say, you know, we agree with you. Having heard the way you've defined those terms, they should have checked those boxes. And since we don't know that the reason why the jury voted guilty was because they didn't check those boxes, as opposed to it should have been in Box 33, that legal error permeates the entire conviction. It affects every single count, and for that reason, the conviction has to be reversed. I obviously used up a lot of my time. I deserve the balance. Good morning, Your Honors. Ronna Katzenstein, Assistant United States Attorney, with Paul Stern, also an Assistant United States Attorney for Plaintiff Appellee Cross-Appellant, United States. Your Honors, this morning I'll address the jury instruction question specifically, unless the Court has any questions about the other instructions, the supplemental instruction given after John Bucell's suicide. My colleague, Mr. Stern, will address the legal sufficiency of the indictment and the evidentiary issues regarding that. And then we will have some things to say with respect to the Blakeley matters. Let me pose to you the same housekeeping question that I posed before, because I've lost track of all the cases. Is there pending before us right now a motion with regard to a supplemental brief in this case? Ronna, I didn't check the docket. I think the last time I checked the docket was early this week. And as of that time, although the motion to file the supplemental brief had been filed by the Court, the brief itself had not yet been filed. So I don't know. It's an unopposed motion for Lee to file the supplemental brief. With respect to the supplemental instruction that was given by the district court during the deliberations regarding the disposition of John Bucell's case, the fact that the case was no longer before the jury, there is no dispute here that plain error review applies to the giving of that instruction. Defendant concedes as much in her briefing of the case, and there was no objection to the instruction below. There was merely a request that a certain condition precedent be met, namely that the case against John Bucell be dismissed, and it was dismissed, and then the instruction was given. In this instance, there is no error, let alone plain error, in the giving of that instruction. It was the model instruction approved by this Court. It's model instruction 2.13. It's an appropriate instruction to give in this case. It is a neutral instruction. As Judge Fogel pointed out, the alternatives being suggested are not neutral and would have prejudiced the government. The alternative of saying that the case had been dismissed would allow the jury to infer that the government thought there was some weakness in its case or there was some problem in the case had the alternative of saying that John Bucell was deceased been used. That again would have risked significant sympathy from the jury on behalf of the defendant. There certainly, in addition to there not being any error, there was no effect on any substantial rights here. To begin with, and before I go to that, let me just say with respect to the notion that it would have been more appropriate to have said that the defendant had the concern with the formulation of the instruction as given was that the jury could infer from that that the defendant, that John Bucell had pled guilty. In fact, in Jones, where the instruction specifically said that the co-defendant had pled guilty, that was a plain error review and no plain error was found in that case. So here we don't even have a specific statement of pleading guilty, which we couldn't have had. There's merely the suggestion that it was possible that the jury might have inferred that. With respect to the substantial rights prong of the plain error review, they are here – in this instance, again, as the Court has already pointed out, there were three acquittals for the defendant, even if the jurors had inferred that there had been a guilty plea from John Bucell, three acquittals were given to the defendant. Two of those were in counts where John Bucell was charged. Defendant claims that these are completely separate. They're not integrally intertwined. With defendant's own conduct, that's not accurate. One of those acquittals was for one of the concealed assets in the bankruptcy, Count 4, the Stein Erikson condo that was as integrally intertwined with the conduct of John Bucell as could be imagined. Secondly, there was no effect on substantial rights here because there was an instruction given that a plea of a co-conspirator should have no impact on the adjudication of the defendants, counts against the defendant. There was also an instruction that the counts should all be – and the defendants should be judged separately and distinctly. I'd like to pursue a little bit the question of why they couldn't have been told he was dead. It's somewhat patronizing. The jury can't be trusted. If he had died in the courtroom in the course of the trial, they would have known it, and there would have been some natural sympathy. I think the government has to take facts as they come along, and he died. Yes, there would have been a little sympathy. Was it wrong sympathy? I don't think so. I think the judge herself was sympathetic. She went down because of the unusual circumstances. So what was so terrible about letting the jury feel a little sympathy because the man had died? Well, a jury is, of course, instructed not that it's inappropriate to base its verdict on sympathy, and it would be a separate question if the Court had, in fact, instructed the jury that the case was no longer before him – before them because the defendant had died. It's a separate question whether or not that in and of itself would have been error. Perhaps it wouldn't have been. I mean, the general rule is tell the truth, and tell the truth of the jury. Don't patronize them. Well, the truth – the case had been disposed of. We did – the case was dismissed. How about the whole truth, or almost the whole truth? Well, again, I do believe – I think if they had said suicide, then he would have seen him guilty, I think. But just dead. The defense never asked for that, and, in fact, below, they never asked the Court to give that instruction. And, in fact, when the jury was sequestered, when there was a motion to sequester the jury, it was to avoid the jury learning of the suicide. And, again, the question here is whether or not it was plain error simply to instruct according to the forum instruction as to the fact that the case had been disposed of. And I would submit to you that it was not. With respect to the Blakeley matters – and then I'll turn the lectern over to my colleague – with respect to Blakeley, between the time of the filing of the government's supplemental brief and today, of course, the Supreme Court has granted cert in Booker and in Fanfan. And in view of that and the fact that the Supreme Court is going to consider the applicability of Blakeley to the Federal guidelines and, if applicable, whether or not that means the guidelines can't be used at all, we would ask that this Court reserve ruling on this matter until the Court has issued some guidance in that regard. Even if the Court does do that, however, we recognize that there are certain issues here that do need to be resolved, which are legal issues. The cross-appeal raises a strictly legal issue, which my colleague, Mr. Stern, is prepared to address if you have questions with respect to that. Also, the restitution order we do not believe would be affected by Blakeley in any case because restitution is ordered under 18 U.S.C. 3663, which does not have a statutory maximum to it. And so, therefore, Blakeley wouldn't apply. And for that proposition, I would cite to the Court U.S. v. Barrett. The issue of the applicability of Blakeley to restitution is in front of many other panels. We will never answer that question. All right. Well, I was not aware of that. If the Court does uphold – if the Supreme Court does uphold the Federal sentencing guidelines, then, of course, the sentencing issues that are before this Court in this matter would be significant ones to be addressed. And I'm prepared to answer any questions you might have about the costs. And my colleague, Mr. Stern, will answer questions with respect to the law. Good morning, Your Honors. I will principally restrict my comments to the fundamental ambiguity claim. If the Court has any questions about the sentencing – the legal issue pertaining to the cross-appeal regarding whether retaining concealed assets constitutes deriving gross receipts, I'll be happy to answer those questions. But for the time being, I'd like to simply address arguments raised by counsel regarding fundamental ambiguity. First, counsel, in his remarks, focused on testimony of the government's expert, Ted Albert. In fact, Mr. Albert also testified about question 33, the cash law. And so the jury had evidence that in the event the property wasn't disclosed in answering any of the previous questions, it would be obliged – a debtor would be obliged to disclose it in response to question 33. And that's – the site to the record is in the government's answering brief on page 21. I'd also like, then, to focus on what was actually charged with regard to the false statement. If you look at paragraph 44 of count 5, where the issue comes up with regard to interest – Do you happen to have a page number reference in the excerpt? I think – I think I saw – I was rummaging through trying to find it. It's the first – the first – I believe it's the first matter in the appellant's excerpt. And it would be count 5, paragraph 44. I have it in a box, but it's a good stamp. I believe it is the – and now I have it in front of me because of my – the good offices of my co-counsel. It's ER 24. Okay. The crime – counsel's correct that matters that are set forth in the conspiracy account are reincorporated, but the crime is set forth in paragraph 43. And the crime, frankly, is under 152, making a false declaration or oath. The false declaration of oath appears on the bankruptcy schedule at the end of the schedule, and it's in a permit as to all the statements. And that's the false statement. And what's charged is – the false statement that's charged is the failure to – the failure to disclose or to omit interest in those corporations. So, in fact, the false statement count is not charged as an answer to question 12. I think, however, it is correct that the government argued that it was appropriate for the jury to focus on the answer to question 12 as well as the answer to question 33, but particularly question 12. And that sort of goes to the issue of whether the term interest is fundamentally ambiguous. So I'd like to submit that, in fact, under the Ninth Circuit law, it's rather clear that it's not fundamentally ambiguous because in order to – first of all, sustaining a claim of fundamental ambiguity is something that I think it's fairly clear is difficult and will only be – you'll only be able to satisfy that in rare cases. And in particular, in the Culliton case, this Court found that simply identifying a number of different possible interpretations of a term is not sufficient to sustain a claim of fundamental ambiguity if it can be shown that the respondent or the defendant understood the answer falsely, the question, and understood that the answer she was giving to the question was false as she gave it. And we would submit there's ample evidence here that that was so, and focusing on question 12 was appropriate in that context because if you look at what the defendant answered in response to question 12, she identified lots of different businesses she had which had no value. The one business – she was a dermatologist. She ran a dermatology corporation. The one business in which she sequestered all her profits, she had $949,000 in a bank account in that corporation. That happened to be the corporation she left off. And she had been talking to a lawyer about how to conceal her interest in that corporation for three years. She had repeatedly consulted with him about what to do with that profit account. And in fact, there's testimony in the record that's cited in her brief that that attorney told her that it would be illegal not to disclose her interest in that corporation if she didn't genuinely give up ownership and control of that corporation. And the testimony of that attorney was also that she refused to do that. In view of those – that extrinsic evidence, I think there was more than sufficient grounds for the jury to infer that she – when she answered that question, she knew that the elephant in the closet, as it were, was BBL, and she wasn't going to put it down there. That was the whole point of this scheme. So it was appropriate to focus on the fact that that was omitted in response to question 12, and that is why it was identified in the indictment. But in the false statement count, which is the count to which a challenge of fundamental ambiguity would apply, the false statement is not the answer to question 12. But similarly, with regard to the claim of fundamental ambiguity as to managing executive, we would submit that there's plenty of evidence to show that she understood in saying that she wasn't a managing executive of any corporation, that she was deliberately answering that question falsely. Because what she had done was she had made her bookkeeper and her office manager the CEO of BBL, the corporation in which she maintained the profits of her medical practice, because she wanted to conceal the fact that she had nothing – that she had anything to do with that corporation. She did not want the trustee to know that she had any involvement in that corporation. That was part of the scheme. There was plenty of evidence as to that. And so from that, the jury had ample evidence to infer that when she answered no to managing executive, she understood the question to call for disclosing her involvement in that corporation as part of her scheme. She deliberately failed to do so. So again, neither of those terms are – we would concede that the terms may be subject to different interpretations. But under the law of this circuit, they're not fundamentally ambiguous. I don't know if I've used that one. To the extent that there is, with respect to our cross-appeal, a legal issue that in the event that matters were mandated and we have to go to a sentencing jury with regard to the propriety of the four-level enhancement, the district court declined to give that enhancement because it seemed to assume as a legal matter that obtaining a benefit by retaining assets, retaining concealed assets, could not constitute deriving gross receipts. We have made arguments in our reply brief to the effect that indeed retaining either fraudulently discharging debts or retaining concealed assets do indeed fit within the definition of gross receipts. And we give essentially two reasons for that. One, the term gross receipts under the guidelines is broadly defined to include any And being relieved of obligations in excess of $2 million, we would submit constitutes deriving an intangible property of benefit and therefore falls within the plain language of the application note pertaining to that enhancement. And second, it's not – she – there was some focus on the district court's part on the fact that she didn't derive anything because she simply retained assets. But when a debtor files a petition, by operation of law, any assets that they have become assets of the estate. And so therefore, she is actually obtaining property to which she's not lawfully entitled when she does not abandon those assets to the trustee, does not disclose those assets. And so it is actually that she is, as it were, taking property for which once she files the bankruptcy petition, she has no legal right to. So for those two reasons, we submit that the district court erred as a matter of law in finding that gross receipts do not qualify. If the Court has questions as to any other matters. Thank you. Thank you. I'll try to speak very quickly. Starting with the point Mr. Stern just made about the cross appeal, two issues. Number one, it's both a factual and a legal aspect to the Court's finding on why the cross – why the four-level adjustment did not apply. The Government didn't say anything about the factual part in its brief, and so it's weighed that. The second argument that Mr. Stern just gave about derived from the bankruptcy of State, that is not an argument that was made in the trial court either in their opening brief or their reply brief in the trial court or in their oral argument in the trial court or in their opening brief on cross appeal. They do mention in the reply brief, but you can't raise an issue for the first time in your reply brief. Turning to the fundamental ambiguity point and interest and a managing executive, as Culliton counsels, if in fact there is evidence in the record of how the person answering the question understood the question, then even if there is an ambiguity, you can ignore it because there's no ambiguity as to the specific person. With Culliton, the question said, have you ever suffered from dizziness or anxiety? And he was concurrently filing a lawsuit because he had fallen out of a chair and said that he had suffered medical and emotional injuries and he was being treated by a physician and a psychiatrist for anxiety and dizziness. So there was no question as to him that he understood the question. It's very different here. The bankruptcy questionnaire, I'm sorry, the bankruptcy schedules, question 12, question 16, there is no evidence in the record that my client understood those questions at all, much less that they understood them the way Mr. Albert, the government's expert, understood them. There was no testimony from Mr. Beaudry about any conversation about any of those terms in the bankruptcy schedules. There was no testimony offered at all from Mr. Sherman, the lawyer who signed the bankruptcy, or Mr. Quinlevan, the bankruptcy paralegal who filled out the bankruptcy petition. There's absolutely no evidence in the record of how those questions are understood. And if nothing else, the fact you have to call an expert witness to explain the terms makes it clear that they are ambiguous. Question 33 is not in the indictment. It's never referenced in the indictment. It wasn't referenced, if I recall correctly, by Mr. Stern in his closing argument. The reference over and over and over again was interest. And in fact, this relationship with BBL is not an interest.  What they're talking about there is if, for example, as had been originally contemplated, there was a stock purchase agreement that would convey certain rights down the road to acquire the stock. That would be an interest. Even though you don't own the stock now, you have an interest in the corporation because you have a legal contractual right. That's what that question is about. It's not about the person who's running the business has a good relationship with you, and if you ask her for access to the money, you can get access to the money. That is not what question 12 is about. Turning very quickly to the supplemental injury instruction, the government says repeatedly in its briefs, and it's said again today, that John Bussell committed suicide. We don't know that John Bussell committed suicide. We know that he fell to his death. There's no suicide note. There was no suggestion that he was contemplating suicide. He was depressed, but he'd been depressed for 15 years. He was being treated. He had not given anybody any warning. He was a religious man. There was really no basis for anyone to say unequivocally, as the government has said here, and as the judge concluded, that he did commit suicide. We don't know. All we know is that he died, and that is what the court should have said. They should have said that he died. What the court, in effect, said is he pleaded guilty. That was highly prejudicial. It was followed swiftly by the conviction, and we cannot say whether we apply the plain error rule or any other rule that that instruction did not affect the fairness and integrity of the proceedings. Thank you. Thank you to all counsel. The case just argued is submitted. We'll proceed to the next case on the calendar, which is the United States v. DeSalle Family Trust.
judges: Noonan, Clifton Fogel